UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
MAURA MINERVA MARTINEZ,

       Plaintiff,

    -against-

ANDREW M. SAUL,[1]
Commissioner of Social Security,

       Defendant.
----------------------------------------------------------------X

**OPINION AND ORDER**

19 Civ. 03499 (JCM)

   Plaintiff Maura Minerva Martinez ("Plaintiff") commenced this action pursuant to 42

U.S.C. § 405(g), challenging the decision of the Defendant Commissioner of Social Security

("the Commissioner"), which denied Plaintiff's application for disability insurance benefits,

finding her not disabled within the meaning of the Social Security Act. (Docket No. 1).

Presently before this Court are (1) Plaintiff's motion for judgment on the pleadings pursuant to

Rule 12(c) of the Federal Rules of Civil Procedure, (Docket No. 14), and (2) the Commissioner's

cross-motion for judgment on the pleadings, (Docket No. 20).  For the reasons set forth herein,

the Commissioner's cross-motion is granted, and Plaintiff's motion is denied.

## I.  BACKGROUND

   Plaintiff was born in 1969. (R.[2] 166).  She filed an application for disability insurance

benefits on September 14, 2015, alleging that she became disabled on March 21, 2015. (*Id.*).

Plaintiff's application was initially denied on November 12, 2015, (R. 88), after which she

requested a hearing, (R. 96), which was held on January 24, 2018, (R. 35-63).  Administrative

---

[1] Andrew M. Saul is now the Commissioner of Social Security and is thus substituted as the Defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[2] Refers to the certified administrative record of proceedings ("Record") related to Plaintiff's application for social security benefits, filed on August 26, 2019. (Docket Nos. 13-1 through 13-14).

Law Judge ("ALJ") Denise M. Martin issued a decision on May 30, 2018, denying Plaintiff's claim. (R. 15-30). Plaintiff requested review by the Appeals Council, which denied the request on February 19, 2019, (R. 1-4), making the ALJ's decision ripe for review.

## A. Medical Evidence

As summarized below, the administrative record reflects mental health treatment[3] Plaintiff received from multiple sources.

### 1. Montefiore Medical Center

On June 25, 2013, Licensed Master Social Worker ("LMSW") Steven Green saw Plaintiff for a psychotherapy session. (R. 321-23, *repeated*, 1490-92). LMSW Green noted that Plaintiff had been receiving treatment "at the AOPD since 6/12/03," had a history of depressive disorder not otherwise specified ("NOS"), was taking medications, and had been previously hospitalized but was presently stable. (R. 321-23). LMSW Green administered a mental status examination, observing that Plaintiff's thought process was logical, she had normal cognition and reasoning, and did not have any hallucinations or delusions. (R. 322). LMSW Green listed Plaintiff's diagnoses as depressive disorder NOS on Axis I, lipoatrophic diabetes on Axis III, chronic physical illness on Axis IV, deferred a diagnosis on Axis II, and assessed that she had a Global Assessment of Functioning ("GAF") score of 80. (*Id.*). At the conclusion of the session, LMSW Green noted that Plaintiff would continue to attend all appointments, take medication[4] as prescribed, and employ stress and anger management techniques. (R. 323).

On August 5, 2013, Plaintiff saw Dr. Dan Zamfir to review her initial assessment and treatment plan. (R. 317-20, *repeated*, 1486-89). Dr. Zamfir conducted a mental status exam that

---

[3] Plaintiff does not challenge the ALJ's decision or findings with respect to her physical impairments. (Docket No. 15 at 3 n.5). Accordingly, the Court's summary of the medical evidence focuses primarily on the mental health treatment Plaintiff received.

[4] LMSW Green did not list what medication Plaintiff was prescribed. (R. 321-23).

was largely unremarkable and largely agreed with LMSW Green's June 25, 2013 diagnoses,[5] except he determined that Plaintiff's GAF score was 86. (R. 318-19).  Dr. Zamfir prescribed Venlafaxin and Abilify, and discussed with Plaintiff the importance of medication management, complying with treatment options, and "psychoeducation" to prevent deterioration. (R. 317-19).

On October 9, 2013, Plaintiff saw Dr. Rebecca Fink. (R. 1483-85).  Dr. Fink's assessment was largely similar to LMSW Green's and Dr. Zamfir's assessments, with the exception of Plaintiff's GAF score, which she scored at 85. (R. 1484).  Dr. Fink prescribed Abilify and Effexor, instructed Plaintiff to check-in for medication management, and encouraged her to continue seeing LMSW Green for therapy. (R. 1484-85).  On December 5, 2013, Plaintiff saw Dr. Fink for a follow-up visit. (R. 1480-82).  Dr. Fink's observations were largely the same as the October 9, 2013 visit, except she lowered Plaintiff's GAF score to 60. (R. 1481).  During a March 12, 2014 follow-up visit, Dr. Fink noted that Plaintiff had been "functioning well overall at work" and her "symptoms [were] well controlled on current meds" with no exacerbation reported to date. (R. 1477-79).  Dr. Fink recommended that Plaintiff continue taking Abilify and Effexor, seeing LMSW Green for therapy, and they discussed transitioning to Dr. Tara Eyma for treatment. (R. 1479).

On June 6, 2014, Plaintiff saw Dr. Eyma for an initial visit. (R. 1474-76).  Dr. Eyma's observations and assessments were similar to Dr. Fink's prior assessments, noting that Plaintiff's GAF score remained at 60, and that Plaintiff was "adjusting well" to a new job. (R. 1475-76).  Dr. Eyma wrote that Plaintiff's symptoms were well-controlled by medication, and recommended that Plaintiff continue taking Abilify and Effexor, and attending therapy with LMSW Green. (R. 1476).  Plaintiff saw Dr. Eyma again on July 28, 2014 for a follow-up visit.

---

[5] Dr. Zamfir also listed diabetes mellitus without mention of complication, type II or unspecified, along with lipoatrophic diabetes. (R. 319).

(R. 1471-73).  Dr. Eyma's observations and notes were largely the same as the June 6, 2014 visit, but Dr. Eyma informed Plaintiff that she would be leaving the clinic so Plaintiff would be transferred to a new psychiatrist. (*Id.*).

On September 25, 2014, Plaintiff saw Dr. Abdelrahman Selim for a medication management visit. (R. 1468-70).  Dr. Selim assessed that Plaintiff had depressive disorder NOS on Axis I, deferred a diagnosis on Axis II, and had a GAF score of 60. (R. 1469).  Dr. Selim wrote that Plaintiff's symptoms "remain[ed] well controlled on current medication regimen," which Plaintiff reported "full . . . adherence" to, and that Plaintiff had recently been "let go from her job," but was searching for another. (*Id.*).  Dr. Selim reviewed Plaintiff's initial assessment plan and recommended that she continue taking Abilify and Effexor as well as attending individual therapy—now with LMSW Jose Rodriguez. (R. 1470).  Plaintiff saw Dr. Selim on December 4, 2014 and reported "compliance most days with medication management," and that she recently started working at Volkswagen. (R. 1510).  Dr. Selim did not make any diagnostic changes but lowered her GAF score from 70[6] to 60. (R. 1511).  Dr. Selim recommended that Plaintiff continue seeing LMSW Rodriguez for therapy and taking Abilify and Effexor. (R. 1512).

On January 20, 2015, Plaintiff saw LMSW Rodriguez for an individual psychotherapy session. (R. 310-13).  Plaintiff reported being "in a good mood and fe[lt] proud," although she expressed anger relating to a situation at work she was "able to 'put the anger at bay.'" (R. 310).  Plaintiff was taking her medication as prescribed and was attempting to use techniques to control her anger. (R. 312).  LMSW Rodriguez's diagnoses were similar to Dr. Selim's diagnosis, noting that Plaintiff had depressive disorder NOS on Axis I, diagnosis deferred on Axis II, chronic physical illness on Axis IV, and a GAF score of 60. (R. 311).  LMSW Rodriguez's summary

---

[6] Dr. Selim wrote that Plaintiff's GAF score was 70 at a prior November 25, 2014 visit. (R. 1511).

note indicated that Plaintiff would continue attending all scheduled appointments, take her medication as prescribed, and continue using stress and anger management techniques. (R. 312). Plaintiff saw Dr. Selim again on February 23, 2015 for medication management. (R. 1507-09). Plaintiff's diagnoses and GAF score remained unchanged, and Dr. Selim noted that Plaintiff's symptoms "remain[ed] well controlled on [her] current medication regimen," and that Plaintiff "denie[d] any mood or psychotic symptoms." (R. 1508).  Dr. Selim recommended that Plaintiff continue taking Abilify and Effexor as prescribed and seeing LMSW Rodriguez for therapy, and follow-up in 12 weeks. (R. 1509).

Plaintiff saw LMSW Rodriguez on March 3, 2015 for a psychotherapy session. (R. 307-09, *repeated*, 314-16).  Plaintiff "began crying during [the] session" and expressed anxiety and anger caused by her co-workers. (R. 307).  Plaintiff's diagnoses were unchanged from her January 20, 2015 visit with LMSW Rodriguez. (R. 308).  Plaintiff reported that she continued to take her medication as prescribed and was controlling her anger despite the issues with her co-worker. (R. 308).  Plaintiff saw LMSW Rodriguez again on March 17, 2015 for psychotherapy. (R. 304-06).  Plaintiff said that she did not disclose her paranoia and delusional thoughts during prior treatment because "she was afraid that anything she disclosed would put people at the facility in jeopardy," and held these beliefs until about six months ago. (R. 304).  Plaintiff expressed relief that "she d[id] not feel this strongly anymore," but indicated that she still "battles with this paranoia," although she attempts to neutralize it using rational thoughts. (*Id.*). LMSW Rodriguez's notes were otherwise largely the same as the March 3, 2015 session, except Plaintiff's GAF score was 65 as opposed to 60. (R. 305).  Plaintiff saw Dr. Selim on April 21, 2015 for a medication management session, where she stated that she was "feeling paranoid" and was "watching over her shoulder [and] looking in a rearview mirror." (R. 1504-06).  However,

Dr. Selim wrote that Plaintiff had no hallucinations or delusions, her thought content had "less paranoia," she was adhering fully to her medication regimen, and her symptoms appeared controlled by the medication. (R. 1505-06).  Dr. Selim increased Plaintiff's Abilify dose and recommended she continue therapy with LMSW Rodriguez. (R. 1506).

Plaintiff saw Dr. Selim on July 20, 2015 for a medication management appointment, where Dr. Selim prescribed Risperidone and took Plaintiff off Aripirazole. (R. 301-03, *repeated*, 1501-03).  Dr. Selim also indicated that Plaintiff's symptoms appeared controlled by medication, her diagnoses remained the same and her GAF score was listed as 65. (R. 1502-03).  During a September 29, 2015 psychotherapy session with LMSW Rodriguez, Plaintiff expressed that she was stressed, but denied paranoia. (R. 298-300).  They discussed an experience Plaintiff had in the psych ward during the 1990s, and Plaintiff informed LMSW Rodriguez she was "unsure if she witnessed a murder," but he wrote that "specifics of her story . . . suggest it may have been part of her paranoid delusion or AVH." (R. 299-300).

Plaintiff saw LMSW Rodriguez on October 2, 2015 for an individual psychotherapy session. (R. 292-94).  Plaintiff arrived unannounced with her parents and said she had not been sleeping and had been giving her medications to a "family member that d[id] not have the means to get it themselves." (R. 292).  LMSW Rodriguez observed that Plaintiff's "psychotic [symptoms] ha[d] reemerged with regards to depression and paranoid delusions." (*Id.*).  Dr. Selim joined the session, and although he did not believe hospitalization was necessary, decided to increase Plaintiff's dose of Risperidone, and also prescribed Ambien and Zolpidem. (*Id.*, *see also* R 1500).  LMSW Rodriguez further noted that Plaintiff signed a consent form for her parents to live with her. (*Id.*).  On a mental status examination, LMSW Rodriguez indicated that Plaintiff had paranoid and persecutory delusions, a depressed mood, and possible auditory verbal

6

hallucinations. (R. 293).  Plaintiff was diagnosed with schizophrenic disorder, depressive type,

depressive disorder NOS on Axis I, and diagnosis deferred on Axis II, and her GAF score was

reduced from 65, which it had been at a September 25, 2015 examination, to 50. (*Id.*).  LMSW

Rodriguez and Dr. Selim issued a treatment plan for Plaintiff to continue to attend bi-weekly

appointments, take medication as prescribed, and use anger and stress management techniques.

(R. 294).

Dr. Selim saw Plaintiff ten days later and she appeared "calmer" and "less anxious" and

reported "feeling better." (R. 1496-98).  Plaintiff's diagnoses remained unchanged from the

October 2, 2015 visit except her GAF score was increased to 65. (R. 1497).  Dr. Selim noted that

Plaintiff's symptoms "remain[ed] well controlled on [her] current medication regimen," that she

did "not appear to be an acute threat to herself or others," and was "[l]ow acute risk status." (R.

1497).  On a mental status examination, Dr. Selim noted that Plaintiff's thought process

"perseverates," but that she had no delusions, her judgment, insight, executive functions, and

concentration were "intact," and she exhibited normal cognition. (R. 1497).  Dr. Selim

recommended that Plaintiff continue taking Risperidone and Effexor and seeing LMSW

Rodriquez for therapy. (R. 1497-98).  Plaintiff saw Dr. Selim again on October 28, 2015 for a

psychiatric follow-up appointment. (R. 1493-95).  Plaintiff requested paperwork for an emotional

support animal, indicated that she was taking her prescribed medication and was feeling better,

and denied hallucinations. (R. 1493).  Plaintiff's diagnoses and GAF score remained unchanged

from her October 12, 2015 visit with Dr. Selim, and he recommended that she continue taking

her medication as prescribed and seeing LMSW Rodriquez for therapy. (R. 1495).

Plaintiff continued to see Dr. Selim for medication management and psychiatric

appointments throughout 2015, 2016, and 2017. (R. 1391, 1395, 1399, 1403, 1408, 1413, 1419,

1424).  At a November 27, 2015 appointment, Plaintiff's symptoms remained largely unchanged; she reported "[d]oing very well recently," and her "[s]leep and appetite [were] intact." (R. 1391). Plaintiff denied having any suicidal or homicidal ideations, acute auditory or visual hallucinations, or paranoid ideations. (*Id.*).  Plaintiff denied suicidal, homicidal, or paranoid ideations, and auditory or visual hallucinations during each visit with Dr. Selim in 2016 and 2017. (R. 1395, 1400, 1404, 1408-09, 1413, 1420, 1424).  Plaintiff continued having some issues with her appetite, weight gain, and sleep, reporting to Dr. Selim during a January 11, 2016 visit that she "had some sleepless nights" and that her "[a]ppetite seems to increase int [sic] the winter." (R. 1395).  However, Plaintiff indicated that these issues resolved themselves during subsequent visits, (R. 1400, 1404, 1409, 1413), with the exception of December 12, 2016, where she reported having "a couple of nights where she didn't sleep much," but believed it was due to high blood sugar, (R. 1420).  Plaintiff continued to adhere to her medication regimen throughout 2015, 2016, and 2017, which Dr. Selim repeatedly indicated controlled her symptoms. (R. 1393, 1398, 1402, 1406-07, 1411, 1416, 1422, 1426).  Dr. Selim continued to list Plaintiff's diagnoses as schizophrenic disorder depressive type, and depressive disorder, and to prescribe Risperidone and Venlafaxine for Plaintiff's irritability and insomnia. (R. 1391, 1393, 1395, 1399, 1402, 1404, 1407, 1409, 1412-13, 1416, 1420, 1422, 1426-27).

Plaintiff was transferred to Dr. Sarah Hodulik, whom she saw on April 3, 2017. (R. 1428-35).  Dr. Hodulik reviewed Plaintiff's medical history and indicated that Plaintiff's "symptoms began ~20 years ago, when she experienced severe sleep disturbance and paranoia and was subsequently hospitalized." (R 1428).  Plaintiff "report[ed] that she fe[lt] 'all right,'" denied depressed mood, and said that she was "typically able to fall asleep after taking Risperdal but occasionally stays up all night even when she takes it." (R. 1429).  Plaintiff denied any suicidal

or violent ideations, and Dr. Hodulik noted that Plaintiff did not have any hallucinations, illusions, or delusions, and that her thought process was "logical/goal directed," and her cognition was "grossly intact." (R. 1429, 1431). Dr. Hodulik assessed that Plaintiff's depressive and schizophrenic symptoms have been "somewhat" improved by Effexor and Risperdal, but her anxiety, irritability, and sleep disturbance persisted. (R. 1434). Dr. Hodulik prescribed Lamictal for Plaintiff's irritability and possible bipolar diagnosis. (*Id.*). In addition, she instructed Plaintiff to continue taking Effexor and Risperdal as prescribed, as well as seeing LMSW Rodriguez for therapy. (*Id.*). Plaintiff had a follow-up visit with Dr. Hodulik on May 23, 2017. (R. 1435-42). Plaintiff reported a noticeable improvement in her anxiety, although her mood remained the same, she denied feeling depressed[7] or having recent thoughts of suicide or violence, reported no hallucinations, illusions, or delusions, and indicated that her sleep was "mostly . . . OK." (R. 1435, 1438). Dr. Hodulik increased Plaintiff's Lamictal dose because she reported "some improvement," and the initial dose was low, and instructed that Plaintiff continue taking Effexor and Risperdal. (R. 1440-41).

Plaintiff saw Dr. Hodulik for a follow-up visit on August 7, 2017, and "report[ed] that her mood ha[d] been 'pretty good'" and that she believes the higher dose of Lamictal, in addition to Effexor and Risperdal, have been helpful. (R. 1442). Plaintiff denied feeling depressed or having any thoughts of self-harm or violence, indicated that her "anxiety fe[lt] manageable," and she was sleeping "OK." (*Id.*). Dr. Hodulik decreased Plaintiff's Effexor dose, concluding that it might "be redundant" given Plaintiff's improvement using Lamictal, and instructed that she continue taking Risperdal, Lamictal, and the reduced dose of Effexor. (R. 1447). Plaintiff saw Dr. Hodulik again on September 18, 2017, reporting that "her mood has been 'OK,'" and "she is

---

[7] Plaintiff still reported feeling "a bit [more] emotionally reactive and irritable than she would like," although she indicated that it still "is perhaps a bit better compared to previously." (R. 1435).

in a good place emotionally." (R. 1449). Plaintiff denied "episodes of staying up all night in recent months" or thoughts of self-harm or violence. (*Id.*). Given that Plaintiff was "doing well," Dr. Hodulik instructed Plaintiff to continue taking her medications as prescribed. (R. 1453).

Plaintiff had a follow-up visit with Dr. Hodulik on November 1, 2017. (R. 1454-57, 1460-61, 1466-67). Plaintiff reported "occasional anxiety and irritability, which ha[d] perhaps been more intense compared to a couple of months ago," but denied feeling depressed and felt she was "coping adequately with stressors." (R. 1454). Plaintiff denied "episodes of staying up all night," hallucinations, delusions or recent suicidal or violent thoughts. (R. 1454-56). Dr. Hodulik increased Plaintiff's Lamictal dose due to her reports of increased irritability but kept the dose of Effexor and Risperdal as previously prescribed. (R. 1460, 1467). Plaintiff saw Dr. Hodulik again on December 13, 2017. (R. 1458-59, 1461-65). Plaintiff said she felt "'calmer' since increasing [her] Lamictal dose" and that "her mood ha[d] been 'OK.'" (R. 1461). Plaintiff continued to deny self-harm or violent thoughts, as well as delusions or hallucinations, reported that her "sleep ha[d] been pretty good," and "believe[d] she [was] in a good place emotionally." (R. 1458, 1461). Dr. Hodulik noted that the higher dose of Lamictal somewhat alleviated Plaintiff's irritability, anxiety, and emotional reactivity, and she continued to prescribe Lamictal, Effexor, and Risperdal. (R. 1464).

## 2. Arlene Broska, Ph.D.

On October 22, 2015, Plaintiff saw Dr. Arlene Broska for a consultative psychiatric evaluation. (R. 259-63). Dr. Broska summarized Plaintiff's psychiatric history, including that she had three prior hospitalizations: (1) in 1997 in Palmetto, Florida for observation; (2) in January 1998 at St. Mary's Hospital where she was treated for depression and mood disorder; and (3) in 2000 at Creedmoor Psychiatric. (R. 259). Dr. Broska noted that Plaintiff was

diagnosed with schizophrenia and was presently seeing a psychiatrist, Dr. Selim, and a therapist. (*Id.*).  Plaintiff reported that her medications were Januvia, Risperidone, Venlafaxine, Diazepam, Atorvastati, Metformin, and Lantus SoloStar insulin. (*Id*)  She also explained that she "ha[d] a history of noncompliance with psychiatric medication because she felt like she did not have a problem," but had taken her Risperidone and Diazepam consistently since August 2015. (R. 259-60).  Plaintiff further reported that she had been "doing okay on her medications" because she had been "taking them 'the right way.'" (R. 260).

Plaintiff denied suicidal and homicidal ideations and indicated that she had only been suicidal "once many years ago." (R. 260).  Plaintiff said she experienced anxiety, getting "impatient and antsy," but explained that she was "doing better on her medications." (*Id.*). Plaintiff feared that someone was going to hurt her, reported psychotic symptoms and stated that she heard voices and conversations in her head that would occasionally ask questions, which she would answer, and could not always discern between reality and hallucination. (*Id.*).  Plaintiff also explained that she struggled with a feeling that someone was following her but that it improved with medication. (*Id.*).  Occasionally, Plaintiff's fears would manifest themselves while she was in the car, causing her to "drive recklessly in order to feel safe." (*Id.*).  Plaintiff also said that at times she has issues with short-term memory and becoming easily distracted, but that also improved with medication. (R. 260-61).

Dr. Broska completed a mental status examination, observing that Plaintiff's appearance was appropriate and her speech adequate, but her thought processes were "marked by paranoid thought patterns." (R. 261).  Plaintiff's attention and concentration were "intact," her recent and remote memory was "within normal limits," and her cognitive functioning was "estimated to be in the average range with general fund of information appropriate to experience." (R. 262).  Dr.

Broska noted that Plaintiff dresses, bathes, and grooms herself, occasionally uses a microwave and cooks, cleans two to three times a week, does laundry every two weeks, shops two to three times a week, attends religious services, occasionally sees friends, but no longer drives because of reckless driving. (*Id.*).

Dr. Broska issued a medical source statement, writing that there was "no evidence of limitation in following and understanding simple directions and instructions, performing simple or complex activities of daily living" or "in attention and concentration or memory." (R. 262). However, there "is evidence for moderate to marked limitation when psychotic symptoms are present in maintaining a regular schedule, performing complex vocational tasks, making appropriate decisions, relating adequately with others, and appropriately dealing with stress." (*Id.*). Dr. Broska further observed that Plaintiff's symptoms "appear[ed] to be consistent with psychiatric problems and it may significantly interfere with [Plaintiff's] ability to function on a daily basis," and that she "appear[ed] only partially stable on her psychiatric medication and ha[d] a long history of noncompliance with treatment." (R. 262-63). Dr. Broska diagnosed Plaintiff with unspecified schizophrenia spectrum and other psychotic disorders and recommended that she continue mental health treatment. (R. 263).

**B. Plaintiff's Testimony**

Gerry Ruiz represented Plaintiff at the January 24, 2018 hearing. (R. 35). Plaintiff testified that she was divorced and lived with her parents and sister. (R. 50). Plaintiff explained that since 2015, her father and sister have been paying her bills when necessary and gave her $100 a month for "basic necessities." (R. 40). Plaintiff had a high school education and obtained an accounting certificate in 2007. (R. 38-39). Plaintiff previously worked as a bookkeeper at an automobile shop until 2015 where she: (1) processed orders, along with expense and inventory

reports; (2) completed warranties for vehicles and canceled warranty contracts; and (3) conducted research in response to inquiries from customers. (R. 39).  Plaintiff testified that she stopped working in 2015 because "[she] was having conflicts" with her manager because he "was always yelling, and making [her] nervous." (R. 49).  Plaintiff explained that she "was [largely] getting along fine with the other workers," but this single supervisor "had [her] in knots" and "stressed [her] out to the point that [she] would get aggravated and sometimes even lash back out." (*Id.*).  Since 1990, Plaintiff also worked as a bookkeeper at a bank, a temporary receptionist, and also "temped for a photographer . . . like two or three times." (R. 51).  Plaintiff also explained that she tried to help her father with his business in 2016, but decided after a week or two that it was "[n]ot for [her] . . . [a]t least not right now." (R. 56-57).

Plaintiff testified that "on a day-to-day basis [she's] able to do stuff," but is not able to "lift heavy things anymore."[8] (R. 44).  Plaintiff testified that she completes "household chores" and has friends that she socializes with "maybe once a month" or "once every month and a half." (R. 52).  Plaintiff testified that while her reading and concentration were fine if she got a "good night sleep," they could be negatively impacted by her insomnia.[9] (R. 57-58).  Plaintiff explained that she is a Jehovah's Witness, goes to Kingdom Hall—a church—every Thursday and Sunday, and engages in outreach work consisting of "carts once a week" and going "door to door . . . maybe once a month or once every two months." (R. 53).  Plaintiff testified that she was a "nature person," and enjoyed hiking and playing volleyball but did so infrequently. (*Id.*).  Plaintiff also testified that she had a dog that she walked, fed, and bathed. (R. 54).  Plaintiff took care of her own personal needs (i.e., bathed, dressed) with some difficulty, which included

---

[8] Plaintiff explained that she was not able to carry or lift much with her left hand.  For example, Plaintiff testified that if she were grocery shopping, she would be able to carry a gallon of milk with her right hand but not her left hand. (R. 44).

[9] Plaintiff testified that she was not prescribed any medication for her insomnia. (R. 58).

having to "lie down on the bed to try to get dressed . . . like two or three times a week." (R. 54-55).  Plaintiff explained she had been a "sociable" and "patient" person up until 2015, when she started "getting riled about anything" and "would explode." (R. 55).  Plaintiff testified that her therapy and counseling were helping her improve. (*Id.*).

Plaintiff testified that she saw Dr. Hodulik, a psychiatrist, once every two months, and LMSW Rodriguez every two weeks. (R. 45).  Plaintiff was prescribed Risperdal and the generic brand of Effexor for her mental health. (*Id.*).  Plaintiff explained that her depression and paranoia caused her to "want[] to be secluded from everyone" and affected her daily activities. (R. 46).  Plaintiff testified that she had been hospitalized twice for mental health issues, the first time in 1997 and the second time in 2000. (R. 46-47).  Plaintiff explained that the medication alleviated her symptoms "a bit" but that she still gets anxious, which causes her to "eat a lot" which adversely affects her blood sugar levels. (R. 47).  Plaintiff had a hard time isolating the precise cause of her anxiety, but believed it might have to do with second-guessing herself. (*Id.*).  Plaintiff testified that she was able to keep track of her doctors' appointments, but had missed some in the past few months due to weather. (*Id.*).

## C. The Vocational Expert's Testimony

Vocational Expert ("VE") Lisa Gagliano testified that she could hear Plaintiff's testimony, albeit "very faintly," and had an opportunity to review Plaintiff's file. (R. 58-59).  The VE explained that Plaintiff's past relevant work consisted of the job title "bookkeeper," which qualified as skilled, sedentary work pursuant to DOT guidelines. (R. 59-60).  The VE also explained that the "second portion of [Plaintiff's] composite job [was] automobile contract clerk," another DOT title that consisted of sedentary work and required a medium level of exertion. (R. 60).  The ALJ posed a hypothetical to the VE, asking her to assume an individual of

Plaintiff's age and education, who had the following limitations: the individual: (1) could not climb ladders, ropes, or scaffolds; (2) could occasionally climb ramps and stairs, as well as balance, stoop, kneel, crouch, and crawl; and (3) was able to perform unskilled, simple, routine, repetitive work, and only interact with supervisors, co-workers, and the public, without any "fast-paced or hypothetical quotas." (*Id.*).  The VE determined that such an individual could not perform Plaintiff's past relevant work but would be able to perform jobs in the national economy, such as: (1) laundry sorter; (2) routing clerk; and (3) housekeeping. (R. 60-61).  The ALJ next asked the VE to assume the same hypothetical individual, except only capable of doing sedentary as opposed to light work. (R. 61).  The VE determined that "work would be preclusive at that level." (*Id.*).  The VE also determined that if the hypothetical individual also were absent two days each month, "that would eliminate the possibility for work at a competitive level." (R. 62).

**D.  The ALJ's Decision**

ALJ Martin applied the five-step procedure established by the Commissioner for evaluating disability claims in her May 30, 2018 decision. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2019).  At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity during the relevant period. (R. 17).  At step two, the ALJ found that Plaintiff had the following severe impairments: schizophrenia spectrum NOS and other psychotic disorder; depressive disorder; diabetes mellitus; and left knee degenerative joint disease. (*Id.*).  At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 18).

The ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with the following limitations: Plaintiff can: (1) occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but should not climb ladders, ropes, or scaffolds; (2) perform unskilled, simple, routine, and repetitive work but should not perform fast-paced work tasks or work with high production quotas; and (3) can occasionally interact with the public, coworkers, and supervisors. (R. 20).

In arriving at the RFC, the ALJ first determined that while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (R. 21). In assessing the medical opinions, the ALJ assigned "some weight" to the portion of the state agency psychological consultant's opinion concerning Plaintiff's moderate mental limitations, as well as "some weight" to Dr. Broska's opinion. (R. 22-23, 28). At step four, the ALJ found that Plaintiff was not able to perform her past relevant work as a bookkeeper and automobile contract clerk, but that jobs existed in the national economy that Plaintiff could perform based on her "age, education, work experience, and [RFC]." (R. 29-30). Accordingly, the ALJ concluded that Plaintiff was "not disabled" under the relevant framework. (R. 30).

## II. DISCUSSION

Plaintiff contends that the ALJ erred by: (1) not properly weighing the opinion evidence in arriving at Plaintiff's mental RFC; and (2) failing to properly evaluate Plaintiff's testimony. (Docket No. 15 at 8-17[10]). The Commissioner argues that the ALJ's decision should be affirmed

---

[10] All page numbers refer to the page numbers assigned upon electronic filing.

because it was supported by substantial evidence and based on correct legal standards. (Docket No. 21).

## A. Legal Standards

A claimant is disabled if she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)).  The Social Security Administration ("SSA") has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008)); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v) (2019).

The claimant has the general burden of proving that he or she is statutorily disabled "and bears the burden of proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128).  At step five, the burden then shifts "to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012).

**B.  Standard of Review**

When reviewing an appeal from a denial of disability insurance benefits, the court's review is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue,* 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 42 U.S.C. § 405(g).  The Court does not substitute its judgment for the agency's, "or determine *de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.,* 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998)). However, where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).  Therefore, "[f]ailure to apply the correct legal standards is grounds for reversal." *Id.*  "Where there are gaps in the administrative record or the ALJ has applied an improper legal standard," remand to the Commissioner "for further development of the evidence" is appropriate. *Rosa v. Callahan,* 168 F.3d 72, 82–83 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

**C.  The ALJ's Mental RFC Determination and Treatment of the Opinion Evidence**

Plaintiff argues that in arriving at Plaintiff's mental RFC, the ALJ erred by: (1) not assigning more weight to Dr. Broska's conclusions concerning Plaintiff's vocational abilities; (2) arbitrarily assigning less weight to Plaintiff's GAF score of 50 than to her GAF scores of 65; and (3) assigning "some weight" to the opinions of a non-examining state agency consultant. (Docket No. 15 at 8-13).  The Commissioner argues that substantial evidence supports both the ALJ's

decision to assign Dr. Broska's and the non-examining state agency consultant's opinions "some weight," and to place more weight on Plaintiff's higher GAF scores. (Docket No. 21 at 17-23).

## 1. Dr. Broska's Opinion

Plaintiff argues that the ALJ largely rejected the limitations Dr. Broska found without good reasons and should have re-contacted Dr. Broska to clarify portions of her opinion concerning Plaintiff's vocational abilities. (Docket No. 15 at 9-11). The Commissioner responds that the ALJ's determination to assign "some weight" to Dr. Broska's opinion was supported by substantial evidence and consistent with the objective medical record. (Docket No. 21 at 17-20). The Court agrees with the Commissioner.

The ALJ appropriately evaluated and weighed Dr. Broska's opinions. In determining that Dr. Broska's opinion was entitled to "some weight," the ALJ provided that she:

> [G]ave some weight to this opinion because the findings of the consultative examiner, the treatment notes from Montefiore, and the documented symptoms lend some support to this opinion. The evidence demonstrates that when the [Plaintiff's] symptoms progressed, such as earlier that month in October 2015, she developed limitations in her thought process that affected her ability to rationalize, deal with others, handle stressors, and to exercise appropriate judgment. However, the record shows that this deterioration was not a frequently recurring event or cycle and that her deterioration occurred when the [Plaintiff] was not compliant with her medications because she was giving her medication to a family member at that time. (Exhibit 6F). The [Plaintiff] still maintained her concentration and memory despite having abnormal thought process during the consultative examination, which supports that she could still perform simple work tasks.

(R. 22-23). As a consultative examiner, Dr. Broska qualifies as a "non-treating source." *Cardoza v. Comm'r of Soc. Sec.*, 353 F. Supp. 3d 267, 283 (S.D.N.Y. 2019) (citing *Dannettel v. Comm'r of Soc. Sec.*, No. 6:12-CV-01890 MAD, 2014 WL 4854980, at *7 n.4 (N.D.N.Y. Sept. 30, 2014)). "Unlike a treating source, 'a nontreating source is defined as a physician, psychologist,

or other acceptable medical source who has examined [the plaintiff] but does not have, or did not

have, an ongoing treatment relationship with [the plaintiff].'" *Id.* (quoting *Calixte v. Colvin*, 14-

CV-5654 (MKB), 2016 WL 1306533, at *24 (E.D.N.Y. Mar. 31, 2016)).  "[T]he same rule

requiring the ALJ [to] provide 'good reasons' to a treating source's opinion does not apply to

non-treating sources." *Pappas v. Saul*, 414 F. Supp. 3d 657, 675 (S.D.N.Y. 2019).  However,

"'[t]he requirement to explain the evaluation of a physician's medical opinion applies to non-

treating physicians as well.'" *Id.* (quoting *Santiago v. Comm'r of Soc. Sec.*, No. 13CV3951-LTS-

SN, 2014 WL 3819304, at *14 (S.D.N.Y. Aug. 4, 2014)).

The crux of the ALJ's decision to assign only "some weight" to Dr. Broska's opinion was

that some of her findings were consistent with the objective medical evidence, whereas others

were not. (R. 22-23).  The ALJ's decision reflects a careful balance between elements of Dr.

Broska's opinion that are supported by the medical evidence with those that were not.

Specifically, the ALJ noted that Dr. Broska's findings concerning Plaintiff's limitations "when

her psychotic symptoms were present," were supported by the treatment notes from October

2015 which documented "limitations in [Plaintiff's] thought process that affected her ability to

rationalize, deal with others, handle stressors, and to exercise appropriate judgment." (R. 22, 262,

292-94).  However, the ALJ expressly indicated that, with the exception of a brief period in

October 2015, "the record shows that this deterioration was not a frequently recurring event or

cycle and that [Plaintiff's] deterioration occurred when [she] was not compliant with her

medications." (R. 22-23).  Indeed, LMSW Rodriguez's and Dr. Selim's notes from January 2015

through September 2015, (R. 312, 1501-03, 1505-06, 1508), as well as Dr. Selim's and Dr.

Hodulik's notes from October 2015 through December 2017, (R. 1398, 1402, 1406-07, 1411,

1416, 1422, 1426, 1429, 1431, 1435, 1438, 1449, 1453, 1442, 1454-56, 1458, 1461), support this

conclusion.  Plaintiff's statements to Dr. Broska during the examination further lend support to

this conclusion. (R. 259-60).  Plaintiff informed Dr. Broska that she "had a history of

noncompliance with psychiatric medications because she felt like she did not have a problem,"

but her psychotic symptoms and anxiety were better controlled once she had been consistently

taking her medications. (R. 259-60).  Plaintiff's argument that "she continued to have significant

symptoms through December 2017" is unavailing and largely unsupported by the record

evidence. (Docket No. 15 at 10-11).  As discussed by the ALJ, these "significant symptoms" to

which Plaintiff refers did not include "psychotic symptoms (i.e. delusions and hallucinations),"

but rather consisted largely of irritability, anxiety, and sleep-related issues. (R. 23, 25-26).

Notably, these issues were also largely resolved and managed by medication prescribed by Dr.

Hodulik. (R. 1435, 1442, 1449, 1461).

Plaintiff also contends that Dr. Broska failed to "comment on how she believed the work

environment would exacerbate [plaintiff's psychotic] symptoms" and that "the ALJ should not

have largely rejected the opinions from Dr. Broska without clarification of how frequently the

psychologist believed [Plaintiff] would suffer disabling mental limitations." (Docket No. 15 at

11).  These arguments are similarly without merit.  The ALJ, in fact, largely credited the portion

of Dr. Broska's opinion concerning the severity of Plaintiff's psychotic symptoms, (R. 22), but

appropriately observed that these symptoms were "not . . . recurring" and manifested themselves

largely because Plaintiff was not adhering to her medication regimen in late September and early

October 2015. (R. 22-23).  Further, the ALJ considered Dr. Broska's opinion regarding the

frequency of disabling limitations when she found that Plaintiff would have "moderate to marked

limitation[s] when psychotic symptoms are present." (R. 22-23, 262).  Moreover, the ALJ

supported her RFC finding by citing notes from Plaintiff's visits with Dr. Selim and Dr. Hodulik

following Dr. Broska's examination which confirmed that Plaintiff's psychotic symptoms were managed well by medication and her mental status examinations were largely normal, with no noted deficits in Plaintiff's memory, attention, concentration, or thought processes. (R. 23-25, 1393, 1397, 1401-02, 1406, 1410-11, 1415-16, 1422, 1425-26, 1430-31, 1436-38, 1444, 1456, 1457, 1459, 1462).  To the extent Dr. Broska's opinion conflicts with Dr. Selim's or Dr. Hodulik's notes, it is well-settled that "[i]t is the ALJ's job to resolve conflicting record evidence and the Court must defer to that resolution." *Gorgos v. Comm'r of Soc. Sec.*, Case # 18-CV-1188-FPG, 2020 WL 128445, at *3 (W.D.N.Y. Jan. 10, 2020) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)).  The ALJ's decision properly considered the fact the Dr. Broska's opinion reflects a snapshot in time that the ALJ appropriately evaluated in light of the longitudinal medical evidence—both predating and postdating the consultative examination—which confirmed the absence of psychotic symptoms when Plaintiff adhered to her medication regimen. (R. 22-25).  "The results of a single examination may not adequately describe [the claimant's] sustained ability to function.  It is, therefore, vital that we review all pertinent information relative to [the claimant's] condition, especially at times of increased stress." *Corporan v. Comm'r of Soc. Sec.*, No. 12-CV-6704 (JPO), 2015 WL 321832, at *28 (S.D.N.Y. Jan. 23, 2015) (quotations and citations omitted).  The ALJ properly considered Dr. Broska's examination in light of the other evidence, which painted a more complete picture of Plaintiff's symptoms, mental status, and ability to engage in work and interact with others.

Finally, Plaintiff's argument that the ALJ should have re-contacted Dr. Broska to clarify when Plaintiff would suffer from "disabling mental limitations" is unavailing. (Docket No. 15 at 11). "If the ALJ already possesses a complete medical history, [s]he is not obligated to re-contact a physician." *Barry v. Colvin*, No. 12-CV-1124S, 2014 WL 1219191, at *3 (W.D.N.Y. Mar. 24,

2014), *aff'd* 606 F. App'x 621 (2d Cir. 2015) (citing *Gray v. Astrue*, No. 09-CV-00584, 2011 WL 2516496, at *6 (W.D.N.Y. June 23, 2011)).  The ALJ had a trove of treatment notes from LMSW Rodriguez, Dr. Selim, and Dr. Hodulik, as well as other professionals Plaintiff saw prior to the relevant period, all of which provided substantial insight into Plaintiff's longitudinal mental health history, and filled in any gaps in Dr. Broska's report from the single examination. (R. 22-25).  Thus, the Court does "not think that the ALJ had any further obligation to supplement the record" by obtaining additional information from Dr. Broska. *Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (summary order); *see also Vanterpool v. Colvin*, No. 12-CV-8789 (VEC)(SN), 2014 WL 1979925, at *16 (S.D.N.Y. May 15, 2014) ("Nonetheless, 'where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.'") (quoting *Rosa*, 168 F.3d at 79 n.5).  Accordingly the ALJ's decision to assign Dr. Broska's opinion "some weight" was supported by substantial evidence.

**2.  The State Non-Examiner's Opinion**

Plaintiff contends that the ALJ erroneously based her mental RFC "primarily on the opinions from a non-examining state agency psychologist." (Docket No. 15 at 9, 11-12).  Other than citing to several cases that generally support the proposition that an opinion from a non-examining physician "[is] generally entitled to the least amount of weight," especially in cases involving mental impairments, Plaintiff provides little argument specific to the instant case. (Docket No. 15 at 11-12).  The Commissioner argues that the ALJ's reliance on the non-examining source "was proper as the psychological expert's opinion is consistent with the overall record reflecting that Plaintiff was symptom-free after her 2015 episode of paranoia, she

consistently denied symptoms of depression or anxiety, and her complaints of anxiety (when they did occur) and irritability were responsive to medication management." (Docket No. 21 at 22).  The Court agrees with the Commissioner.

"It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability." *Henry v. Astrue*, 32 F. Supp. 3d 170, 181 (N.D.N.Y. 2012).  The ALJ did not err by assigning "some weight" to the state agency non-examining psychological consultants, who opined that Plaintiff "had moderate mental limitation[s]," (R. 28), as it is clear that these opinions "are supported by the weight of the evidence," *Henry*, 32 F. Supp. 3d at 182.  In fact, the non-examining state agency psychologist's assessment of Plaintiff's limitations frequently aligned with Dr. Broska's, as both opined that Plaintiff had few limitations—if any—following and understanding simple instructions and directions and performing simple or complex tasks but would be moderately limited completing some tasks associated with employment. (R. 70-72, 81-83, 262-63).  Accordingly, the ALJ did not err in assigning "some weight" to the state non-examining psychologist's opinion because it was consistent with other opinions and evidence in the record and based on substantial evidence. *See Piatt v. Colvin*, 80 F. Supp. 3d 480, 495 (W.D.N.Y. 2015) (finding no error where the ALJ relied on a non-examining physician's opinion that was "supported by . . . ample medical evidence"); *see also Leach ex rel. Murray v. Barnhart*, No. 02 Civ. 3561 RWS, 2004 WL 99935, at *9 (S.D.N.Y. Jan. 22, 2004) (finding reliance on a state agency opinion where it was "consistent with the record as a whole").

### 3. The ALJ's Treatment of the GAF Scores

Plaintiff argues that the ALJ erred by assigning "great weight" to the GAF scores of 65 while "rejecting GAF scores of 50." (Docket No. 15 at 12).  Plaintiff explains that "[a]part from the fact that the ALJ made explicitly conflicting findings on the value of the GAF scores" they otherwise do not provide a reliable analysis of a Plaintiff's mental functioning. (*Id.*).  The Commissioner counters that Plaintiff misconstrues the record, and that the ALJ appropriately determined that the GAF score of 50 represented a "'snapshot' of Plaintiff's functioning during a finite period of time," whereas the scores of 65 "were reported over a longer period of time." (Docket No. 21 at 22-23).  The Court agrees with the Commissioner.

"The GAF is 'a scale that indicates the clinician's overall opinion of an individual's psychological, social, and occupational functioning,' and runs from 0 to 100." *Salisbury v. Saul*, No. 19-CV-706 (JLC), 2020 WL 913420, at *13 n.11 (S.D.N.Y. Feb. 26, 2020) (quoting *Maldonado v. Berryhill*, No. 16-CV-165 (JLC), 2017 WL 946329, at *8 n.21 (S.D.N.Y. Mar. 10, 2017)).  "The Social Security administration has explained that '[u]nless [a] clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the [Plaintiff's] mental functioning for a disability analysis.'" *Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019) (quoting U.S. Soc. Sec. Admin., Office of Disability Programs, AM-13066, Global Assessment of Functioning (GAF) Evidence in Disability Adjudication (Oct. 14, 2014)).  "Furthermore, unless the GAF rating is well supported and consistent with other evidence in the file, it is entitled to little weight under our rules." *Id.* (quotations and alterations omitted).

The ALJ assigned "great weight" to Plaintiff's GAF scores of 65 from March 2015 through September 2015, and "some weight" to his GAF score of 50 from October 2015. (R. 21-

22).  The ALJ specifically noted in the decision that "GAF scores are a snap shot of the [Plaintiff's] functioning at the time of the assessment and not representative of the [Plaintiff's] functioning throughout the relevant period." (R. 22).  Although the GAF scores recorded in the medical records were not explicitly accompanied by reasons, the ALJ appropriately noted that they were "consistent with other evidence in the file," namely the contemporaneous notes taken by Dr. Selim and LMSW Rodriguez. (R. 21-22).  Specifically, LMSW Rodriguez and Dr. Selim rated Plaintiff's GAF score at either 60 or 65 between March 2015 and October 2015, and made accompanying notes which reflected moderate psychotic symptoms at most, that were controlled by medication, moderate levels of anxiety and insomnia, and largely normal mental status examinations. (R. 301-09, 1496-98, 1502-03, 1505-06).  The ALJ also noted that the October 2, 2015 treatment notes which showed a resurgence of Plaintiff's "delusions" and psychotic symptoms supported a GAF score of 50. (R. 22, 292-94, 1500).  The ALJ concluded that the single GAF score of 50 reflected a low point and was not entitled to great, but rather, some weight. (R. 22).  Thus, because the GAF scores were consistent with other medical evidence in the record, it was not improper for the ALJ to assign them differing weight. *See e.g.*, *Pena Lebron v. Comm'r of Soc. Sec.*, No. 18-CV-125 (BCM), 2019 WL 1429558, at *15 (S.D.N.Y. Mar. 29, 2015) (no error where the ALJ relied on plaintiff's GAF score, as well as normal findings in mental health treatment records in assigning treating physician's opinion little weight); *Mainella v. Colvin*, No. 13-CV-2453-JG, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014) (finding that the ALJ did not err in treating the GAF scores as opinion evidence where the scores of 65-70 "were consistent with both medical opinion and [Plaintiff's] self-reported activities" and the ALJ "looked to the underlying bases for those numbers and analyzed them in the context of the evidence as a whole").  Moreover, the ALJ did not solely rely on the GAF

scores to arrive at Plaintiff's RFC or to discount medical opinions in the record, but rather used the scores in conjunction with other medical evidence to support the ultimate RFC determination. (R. 21-22, 28).  This further demonstrates that the use of the GAF scores was not in error. *See Narvaez v. Comm'r of Soc. Sec.*, 1:18-cv-01130 (SDA), 2019 WL 4386030, at *13 (S.D.N.Y. Sept. 13, 2019) (no error where "the ALJ did not rely solely on the GAF score, but also relied on evidence from [Plaintiff's] treatment records to support the weight he assigned [to a treating physician's] opinion.").

Furthermore, the ALJ did not err "in assigning differing weights to the various [GAF scores] … because 'giving different weight to different parts of a medical opinion is generally acceptable.'" *Pappas*, 414 F. Supp. 3d at 674 (quoting *Brush v. Berryhill*, 294 F. Supp. 3d 241, 262 (S.D.N.Y. 2018)).  The ALJ explicitly provided reasons for the different weights, namely, that the scores of 65 were consistently issued between March and September 2015 and were supported by treatment notes, whereas the score of 50 was issued during a single examination on October 2, 2015 and supported by evidence of Plaintiff's "noncompliance due to giving away her medications coupled with the resurgence of delusions support[ed]." (R. 21-22).  The ALJ also noted that "GAF scores are a snap shot of the [Plaintiff's] functioning at the time of the assessment and not representative of the [Plaintiff's] functioning throughout the relevant period." (R. 22).  Indeed, as discussed *supra* Section II.C.1, the majority of Plaintiff's medical records point to psychotic symptoms, anxiety, and sleep issues that were alleviated and controlled by medication, as well as largely normal mental status examinations, thus supporting a GAF score of 65. *See Petrie v. Astrue*, 412 F. App'x 401, 406 n.2 (2d Cir. 2011) (summary order) (noting that a GAF score of 65 "indicate[s] some mild symptoms or some difficulty in social, occupational, or school situations, but general functioning and the existence of some meaningful

personal relationships.").  Accordingly, the ALJ did not err in the weights she assigned

Plaintiff's GAF scores, or in using them in assessing her RFC.

## D.  The ALJ's Credibility Determination

Plaintiff argues that the "ALJ's evaluation of [Plaintiff's] subjective statements is not

supported by substantial evidence," and that the ALJ erred by: (1) "criticizing [Plaintiff's] course

of treatment;" (2) finding that "no objective evidence supports [Plaintiff's] allegations;" and (3)

finding that Plaintiff's daily activities undercut her subjective complaints. (Docket No. 15 at 13-

17).  The Commissioner contends that the ALJ's determination concerning Plaintiff's subjective

claims was supported by substantial evidence, and she appropriately considered Plaintiff's

treatment record and self-reported daily activities. (Docket No. 21 at 23-26).  The Court agrees

with the Commissioner.

The SSA's regulations provide a two-step process for evaluating a claimant's assertions

of pain and other limitations.  First, "the ALJ must decide whether the claimant suffers from a

medically determinable impairment that could reasonably be expected to produce the symptoms

alleged." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  Second, if the claimant does suffer

from an impairment, "the ALJ must consider the extent to which [the claimant's] symptoms can

reasonably be accepted as consistent with the objective medical evidence and other evidence of

record." *Id.* (internal quotations and citation omitted).  The ALJ considers the claimant's

activities, the location, duration, frequency and intensity of the pain or other symptoms,

precipitating and aggravating factors, medication and other treatment, measures taken by the

claimant to relieve pain or other symptoms, and other relevant factors. 20 C.F.R. §§

404.1529(c)(3), 416.929(c)(3) (2019).  After considering these factors, the ALJ "has the

discretion to evaluate the credibility of a claimant and to arrive at an independent judgment . . .

28

regarding the true extent of the pain alleged by [plaintiff]." *Martinez v. Astrue*, No. 10 CIV. 9284

(PKC), 2012 WL 4761541, at *11 (S.D.N.Y. Aug. 1, 2012) (quoting *Minims v. Heckler*, 750

F.2d 180, 186 (2d Cir. 1984)); *see also Genier*, 606 F.3d at 49 (the ALJ "may exercise discretion

in weighing the credibility of the claimant's testimony in light of the other evidence in the

record."). "If these findings are supported by substantial evidence, the court must uphold the

ALJ's decision to discount plaintiff's subjective complaints of pain." *Martinez*, 2012 WL

4761541, at *11 (citing *Aponte v. Sec'y of Dep't of Health and Human Servs.*, 728 F.2d 588, 591

(2d Cir. 1984)). "In addition, 'courts must show special deference to an ALJ's credibility

determinations because the ALJ had the opportunity to observe plaintiff's demeanor while [the

plaintiff was] testifying.'" *Mayor v. Colvin*, 15 Civ. 0344 (AJP), 2015 WL 9166119, at *19

(S.D.N.Y. Dec. 17, 2015) (quoting *Marquez v. Colvin*, 12 Civ. 6819 PKC, 2013 WL 5568718, at

*7 (S.D.N.Y. Oct. 9, 2013)).

The ALJ found "that the [Plaintiff's] medically determinable impairments could

reasonably be expected to cause the alleged symptoms; however, the [Plaintiff's] statements

concerning the intensity, persistence, and limiting effects of these symptoms are not entirely

consistent with the medical evidence and other evidence in the record for the reasons explained

in th[e] decision." (R. 21). The ALJ then proceeded to meticulously evaluate the objective

medical evidence, Plaintiff's testimony concerning her activities of daily living, as well as

Plaintiff's treatment history. (R. 21-28). The ALJ's determinations concerning the three areas

challenged by Plaintiff are all supported by substantial evidence, and this Court finds no

legitimate basis to disturb the credibility determinations made by the ALJ.

Plaintiff argues that it was error for the ALJ to consider Plaintiff's conservative treatment

because "the fact that Plaintiff had a response to her treatment is not evidence that she can

sustain a full-time job in the real world of work." (Docket No. 15 at 15). "While a conservative treatment regimen, without more, is insufficient to justify the denial of disability benefits, an ALJ may consider it in combination with other factors." *Vasquez v. Saul*, 16-CV-3610 (VSB)(DCF), 2019 WL 5682631, at *8 (S.D.N.Y. Nov. 1, 2019) (internal citation omitted). The ALJ considered Plaintiff's response to conservative treatment, which consisted largely of medication management and psychotherapy, in conjunction with other factors, including Plaintiff's activities of daily living, reported work activity, and objective medical evidence. (R. 21-28). In assessing Plaintiff's treatment, the ALJ cited to Plaintiff's treatment history from March 2015 through December 2017, which demonstrated that Plaintiff's most severe symptoms (i.e., hallucinations and paranoia) were managed by medication, and only made a significant resurgence in early October 2015 when Plaintiff was "giving away her psychoactive medications and not using them as prescribed." (R. 22, 25). This assessment is supported by the record, which demonstrates that following October 2015, Plaintiff's symptoms were controlled by medication and her mental status examinations were normal. (R. 1393, 1398, 1402, 1406-07, 1411, 1416, 1422-23, 1426, 1429, 1431, 1435-36, 1438, 1442-44, 1449, 1453, 1454-56, 1458-59, 1461). Moreover, it was proper to consider Plaintiff's failure to adhere to her medication regimen in assessing Plaintiff's credibility. *See Wells v. Colvin*, 87 F. Supp. 3d 421, 432 (W.D.N.Y. 2015) ("Because the medical record shows that Plaintiff was noncompliant with medications and inconsistent in following medical advice . . . the ALJ did not err in considering Plaintiff's noncompliance in evaluating Plaintiffs [sic] credibility") (citing SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996)).

In finding that Plaintiff's daily activities did not support Plaintiff's subjective complaints, the ALJ relied on Plaintiff's testimony as well as the medical notes. (R. 27). The ALJ noted that

Plaintiff: (1) "performed chores, such as cooking, washing dishes, washing laundry, and shopping for groceries;" (2) cared for her dog; (3) drove independently; (4) continued to participate in twice-weekly religious services as a Jehovah's Witness, which included "door-to-door outreach once every two weeks;" and (5) socialized with friends on a monthly basis. (R 27). In addition to Plaintiff's daily activities, the ALJ cited examination notes which demonstrated that Plaintiff continued to seek employment, including receiving a part-time job as a receptionist that she "wait[ed] to accept" because she "wanted to know if [it] would impede her disability claim hearing." (R. 23-24, 27-28). These findings demonstrate that Plaintiff was able to function at a reasonably high level. *See, e.g.*, *Rutkowski v. Astrue*, 368 F. App'x 226, 230 (2d Cir. 2010) (summary order) (affirming district court's judgment that the ALJ "adequately supported his credibility finding" where "substantial evidence existed showing that [plaintiff] was relatively 'mobile and functional,' and that [plaintiff's] allegations of disability contradicted the broader evidence"); *Alejandro v. Comm'r of Soc. Sec.*, 17-CV-2906 (JPO), 2018 WL 4328839, at *4 (S.D.N.Y. Sept. 11, 2018) (no error where the ALJ determined that the plaintiff's "own statements about her daily conduct were inconsistent with her allegations of disability").

Finally, the ALJ determined that the objective medical evidence supported "some functional limitations, "such as Plaintiff's ability "to perform unskilled, simple, routine, repetitive work," but not occupations requiring "fast-paced work tasks" or frequent interaction with the public, coworkers, and supervisors. (R. 26-28). In addition, the ALJ appropriately determined that the medical record did not support Plaintiff's claim that her depression, self-isolation, paranoia, mood swings, and anxiety were so debilitating as to render her disabled. (R. 20-21, 25, 28). Indeed, LMSW Rodriguez's and Dr. Selim's notes from January 2015 through September 2015, (R. 312, 1501-03, 1505-06, 1508), as well as Dr. Selim's and Dr. Hodulik's

notes from October 2015 through December 2017, (R. 1398, 1402, 1406-07, 1411, 1416, 1422,

1426, 1429, 1431, 1435, 1438, 1449, 1453, 1442, 1454-56, 1458, 1461), further support this

conclusion.  Thus, because the ALJ's "analysis explained h[er] reasoning with sufficient

specificity for the Court to review, and there was substantial evidence in the record to support

h[er] conclusions," the Court finds no error. *Bueno v. Comm'r of Soc. Sec.*, 17-CV-1847

(VSB)(RWL), 2018 WL 5798583, at *15 (S.D.N.Y. Aug. 20, 2018), *report and recommendation*

*adopted*, 2018 WL 5791967 (S.D.N.Y. Nov. 5, 2018); *see also Stanton v. Astrue*, 370 F. App'x

231, 234 (2d Cir. 2010) (summary order) ("We have no reason to second-guess the credibility

finding in this case where the ALJ identified specific record-based reasons for his ruling.").

Accordingly, the Court finds no reason to disturb the ALJ's credibility determination

because it was supported by substantial evidence.

## III.  CONCLUSION

For the foregoing reasons, the Commissioner's cross-motion is granted, and the

Plaintiff's motion is denied.  The Clerk of the Court is respectfully requested to terminate the

pending motions, (Docket Nos. 14 and 20), and close the case.

Dated:   May 26, 2020
         White Plains, New York

SO ORDERED:

JUDITH C. McCARTHY
United States Magistrate Judge